HOLDGRAFER, Appellant, vs. TOWN OF BENTON, Respondent.

*October 9—December 3, 1918.*

*Bridges and culverts: Repairs: Strength.*

In sec. 1322*m*, Stats. 1917, the words "no such bridge or culvert" refer to the kind of bridge or culvert theretofore mentioned in the section; hence, every "iron, steel or concrete bridge or culvert of more than four feet in length of span" must, when repairs are made thereon, be left strong enough to sustain a load of fifteen tons. ESCHWEILER and KERWIN, JJ., dissent.

APPEAL from an order of the circuit court for La Fayette county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Action to recover damages for injuries sustained on a highway of defendant town caused by a thirteen-ton tractor falling through an iron and steel bridge fifty-two feet long constructed prior to July 12, 1911, but repaired subsequent thereto. The defendant demurred to the complaint, which alleged these and other appropriate facts. From an order sustaining the demurrer the plaintiff appealed.

The cause was submitted for the appellant on the brief of *J. W. Murphy* of Platteville and *J. D. Dunwiddie* of Monroe, and for the respondent on that of *S. E. Smalley* of Cuba City and *Orton, Osborn & McDaniel* of Darlington.

VINJE, J.   The circuit court sustained the demurrer to the complaint, holding that under the provisions of sec. 1322*m*, Stats. 1917, no duty devolved upon the town to repair the bridge in question so that it would sustain a weight of more than ten tons. The correctness of this ruling is challenged by the appellant. Sec. 1322*m* provides:

"From and after the passage and publication of this act, no iron, steel or concrete bridge or culvert of more than four feet in length of span shall be constructed in any highway in this state unless it shall be designed, according to standard engineering practice, to have sufficient strength to carry, without planking, any load that may be driven or propelled upon, on or along such bridge or culvert, of not more than

fifteen tons, and no such bridge or culvert shall be repaired unless such repairs shall leave such bridge or culvert in such condition that it shall have sufficient strength, according to standard engineering practice, to carry, without planking, any load that may be driven or propelled upon, on or along such bridge or culvert, of not more than fifteen tons."

Previous to the passage of ch. .642, Laws 1911, now the section quoted, which took effect July 12, 1911, bridges of the class in question were not required to sustain a weight of more than ten tons. It is a matter of common knowledge that the weight of loads on country highways has of late years steadily increased. We have heavier threshing machines, engines, and tractors; and auto drays carrying heavy loads are in use as well as heavy road machinery of various kinds. Owing to such increase in the weight of loads the legislature made provision for stronger bridges, first, by construction, and second, by repair. It is clear that every bridge of the class mentioned in the section, to wit, every "iron, steel or concrete bridge or culvert of more than four feet in length of span," constructed after July 11, 1911, must be so constructed as to maintain a weight of fifteen tons or more. The law then says that "no such bridge or culvert shall be repaired unless such repairs shall leave such bridge or culvert in such condition that" it shall sustain a weight of fifteen tons. The word "such" is an adjective and relates to the kind of bridge or culvert mentioned in the first sentence and not to the time of its construction. The words "no such bridge or culvert" take the place of the words "no iron, steel or concrete bridge or culvert of more than four feet in length of span." So that it is just the same as if the law read, "from and after the passage and publication of this act no iron, steel, or concrete bridge or culvert of more than four feet in length of span shall be repaired," etc. If the provision as to repairs related only to bridges of the class mentioned which are constructed after the passage of the act it would be superfluous, for a bridge required to be constructed to sustain a weight of fifteen tons must, *ipso facto,*

be kept in repair to sustain that weight. No additional provision is necessary to declare that duty. The legislative intent was to make all new bridges of the required kind sustain fifteen tons and to bring old bridges of the required kind into the fifteen-ton class when they were repaired. In this way, and only in this way, could the legislature without too much expense to municipalities gradually and within a reasonable time bring all bridges into the fifteen-ton class. A contrary construction would permit all bridges built prior to 1911 to remain indefinitely in the ten-ton class, and highways would continue indefinitely to be inadequate to sustain modern loads. It is evident, therefore, that the circuit court erred in its construction of the statutes.

*By the Court.*—Order reversed, and cause remanded with directions to overrule the demurrer, and for further proceedings according to law.

Eschweiler, J. *(dissenting)*. The adjective "such," in the phrase "and no *such* bridge or culvert shall be repaired unless such repairs shall leave such bridge or culvert in . . . condition . . . to carry . . . any load . . . of not more than fifteen tons," can, without violating any rules of grammar or logic, be held to only refer to the bridges or culverts of iron, steel, or concrete which are constructed subsequent to the passage of ch. 642, Laws 1911, and therefore only to those of fifteen tons original capacity.

The primary subject matter of this chapter, creating as it does new statutes and not merely amendments of the old, is to provide by express language a new standard of a carrying capacity of fifteen tons for bridges thereafter constructed of iron, steel, or concrete. It manifestly creates a new condition or requirement, to be considered and met when the electors vote upon the questions relating to the construction of new bridges and the issuance of bonds therefor, or when the proper officers of such municipalities must perform duties required of them as to such construction.

It is expressly aimed at the bridge of the future and not at that of the past, and all its provisions can be construed in harmony with that primary object and should not, as is done by the majority opinion, be held to the future by the express, and then to the past by the implied, language. If the legislature had intended the result reached by the majority opinion, that all iron, steel, or concrete bridges of over four feet span theretofore erected but of ten-ton carrying capacity should also, upon the happening of such a contingency as the needing of repairs, be then and thereupon transformed into bridges or culverts of a capacity of one and one-half times their original construction, how easy it would have been to insert in the new statutes, created in lieu of the above quoted portion of sec. 1322*m*, a provision in substance, "and no iron, steel, or concrete bridge hereafter or heretofore constructed shall," etc. *Milwaukee v. Ritzow,* 158 Wis. 376, 149 N. W. 480. I prefer to acquit the legislature of any such paucity of expression or of preferring the occult to the direct method of legislation.

That the intent was to couple the idea of repair with only such new bridges of fifteen tons original capacity is further strengthened by a consideration of the language of sec. 1322*o* as created by the same chapter, and which fixes a liability upon owners of traction engines for all damages caused to a bridge or culvert by the driving of a load in excess of fifteen tons "upon or along any bridge or culvert *constructed* in compliance with section 1322*m* of the statutes, or *constructed and repaired* in compliance with said section."

No provision can be found in this section for any such liability when driving such a vehicle of excess weight upon the kind of bridges now read into sec. 1322*m* by the majority opinion, namely, bridges of ten tons capacity required to be repaired or rebuilt of fifteen tons capacity, for such bridges are neither "constructed" nor "constructed and repaired" in compliance with sec. 1322*m*.

There may well have been within the legislative mind, at

the time it expressed its intent by the passage of this chap-
ter in 1911, knowledge of the fact that an iron or steel
bridge built to comply with the then requirements of ten
tons carrying capacity could not, owing to the necessary
changes in at least the floor construction, be changed to one
of fifteen tons capacity except by practically rebuilding the
entire structure and at probably a cost nearly equal to that
of an entirely new bridge.   In effect, then, as far at least as
steel or iron bridges are concerned, the construction given
by the majority opinion to the word "repair" makes it equiv-
alent to "rebuild" or "remodel."  The substantial difference
there is between the terms "repair" and "remodel" is pointed
out in the very recent case of *Cotter v. Joint School Dist.*
164 Wis. 13, 158 N. W. 80.  The practical effect of the ma-
jority opinion herein will be to make the terms identical.

I do not think the legislature meant to alter the position,
as lawful structures, of the then constructed iron, steel, and
concrete bridges, any more than it did as to the then con-
structed wooden bridges, and that the use of the word "re-
pair," as above quoted, simply meant that when such new
fifteen-ton bridge was once constructed it should not be per-
mitted, from lack of repairs, to become of a lessened ca-
pacity.

From the third biennial report of the Wisconsin Highway
Commission, December, 1916, on page 22, it appears that
there was not at that time even, five years after the passage
of this act, any definite knowledge as to the number of
bridges existing in this state.   Their estimate, however, in
1916, is of a total of 32,000 bridges of over six feet span,
including wooden bridges.  As construed by the majority
opinion, the moment any one of the bridges constructed be-
fore 1911 of iron, steel, or concrete needs repairs—and that
might mean no more than the replacing of a broken plank
or the mending of a railing,—such old bridge must from that
moment be transformed to a fifteen-ton bridge, no matter
how substantial the original structure may have been as a
ten-ton bridge, no matter how trifling may be the expense of

the necessary repairs or how excessive and burdensome the expense of reconstructing the same.

By the same report of the highway commission and on the same page it appears that the average cost of construction of bridges as planned and supervised by the commission is now about $38 per lineal foot. The same report suggests that there should be rebuilt, for the sake of safety and for economy in maintenance, about 28,000 of such old bridges, including wooden, and at an estimated cost of $32,000,000. The significance of these figures here lies in the fact that the commission suggests that these changes should be made within the twenty years following their report in 1916. The practical effect of the majority opinion herein will undoubtedly throw a large portion of that $32,000,000 upon the immediate future.

The further difficulties that the construction by the majority opinion of this chapter is going to present to the municipalities chargeable with the building of such structures are very apparent upon a consideration of the statutory proceedings preliminary to bridge construction and necessary to be taken under ch. 52, Stats., "Highways and Bridges," particularly where such bridges are within one or more towns or across navigable streams; the various provisions for voting by the electors of the municipalities interested and for the giving of bonds, and the various limits placed upon the powers of such municipalities and their officers as to the repairing of such bridges in excess of a certain specified amount; and the uncertainties and confusion that must surely result in determining whether such enforced transformation of bridges from ten to fifteen-ton capacity is now under the majority opinion herein within the statutory provisions as to repairs of bridges or of the rebuilding of bridges.

I am authorized to state that Justice KERWIN concurs in this dissent.

OWEN, J., took no part.